UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | |
|---|---|
| CHELSEY R. DUNLAP, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 2:12 CV 14 JCH |
| ) | |
| CAROLYN W. COLVIN,[1] ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the applications of plaintiff Chelsey R. Dunlap for child's disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. § 401, et seq., and for supplemental security income under Title XVI of that Act, § 1381, et seq. For the reasons set forth below, the decision of the Administrative Law Judge is reversed and remanded for further proceedings.

## I. BACKGROUND

Plaintiff Chelsey R. Dunlap was born on September 20, 1990. On April 16, 2009, she filed applications for child's disability benefits, based upon the account of a deceased wage earner, George Dunlap, under Title II and Title XVI . (Tr. 109-18.) She alleges the onset date of her disability as April 16, 2009, when she was 18, due to scoliosis, back problems, and attention deficit hyperactivity

---

[1]On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security. The court hereby substitutes Carolyn W. Colvin as defendant in her official capacity. F.R.Civ.P. 25(d).

disorder. (Tr. 125, 140-48.) Plaintiff's applications were denied initially on February 9, 2009, and she requested a hearing before an ALJ. (Tr. 55-61.)

On February 23, 2011, following a hearing, the ALJ found plaintiff was not disabled. (Tr. 10-19.) On February 1, 2012, the Appeals Council denied plaintiff's request for review. (Tr. 1-3.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. MEDICAL HISTORY

On November 18, 2004, at age 14, plaintiff saw Daniel Hoernschemeyer, M.D., complaining of mild back pain that increased in severity during activity. Dr. Hoernschemeyer assessed plaintiff with adolescent idiopathic scoliosis. Plaintiff stated that scoliosis did not significantly limit her from playing basketball, skating, or riding bicycles. Plaintiff and her mother discussed surgery with the doctor. (Tr. 241-43.)

On December 30, 2004, plaintiff saw Jeffrey Cramp, D.O., to discuss her scheduled surgery, and on January 4, 2005, Dr. Hoernschemeyer performed an anterior spinal release and fusion procedure. On January 13, Dr. Hoernschemeyer performed posterior final fusion and segmental instrumentation from T2 to L4,[2] a right thoracoplasty,[3] and autogenous bone graft procedures on plaintiff. On January 14, plaintiff began physical therapy and complained that standing and walking caused dizziness and back pain. Physical therapists Jamie Fessler and Beth Schukman informed her

---

[2] The human spinal column consists of thirty-three vertebrae. There are seven cervical vertebrae (denoted C1-C7), twelve thoracic vertebrae (denoted T1-T12), five lumbar vertebrae (denoted L1-L5), five sacral vertebrae (denoted S1-S5 and fused together into one bone, the sacrum), and four coccygeal vertebrae (fused together into one bone, the coccyx). The cervical vertebrae form part of the neck, while the lumbar vertebrae form part of the low back. The sacrum is immediately below the lumbar vertebrae. Stedman's Medical Dictionary, 2117-18 (28th ed., Lippincott Williams & Wilkins 2006) (Stedman).

[3] Thoracoplasty is an operation that corrects deformities of the chest wall. Stedman at 1982.

-2-

of several precautionary techniques for movement and recommended that she continue physical therapy. On January 18, plaintiff was discharged with prescriptions of Percocet and Valium for pain. (Tr. 224-40.)

On February 3, 2005, plaintiff was examined by Matthew Smith, M.D., as a follow-up to her surgery. Plaintiff complained of shoulder blade pain but reported improved mobility. Dr. Smith refilled her Valium prescription for the shoulder blade pain. (Tr. 245-47.)

On March 3, 2005, plaintiff saw Dr. Hoernschemeyer for another follow-up examination for her surgery. She complained of acute pain in her spine and right shoulder. Dr. Hoernschemeyer observed that her surgery wound had healed. He recommended that she take less Percocet, begin taking Vicodin for pain, and increase her time spent at school from two hours per day to four hours per day "as she wants." (Tr. 267-69.)

On April 28, 2005, plaintiff reported pain in her left hip and numbness on her thigh. Her pain had improved, and she asked whether she could play basketball. Dr. Hoernschemeyer advised plaintiff to continue decreasing her Vicodin dosage. (Tr. 269-71.)

On August 11, 2005, plaintiff complained of numbness around her surgery incision, but no longer reported numbness in her thigh. Dr. Hoernschemeyer noted that she was "making very good progress." (Tr. 273-75.)

On September 14, 2005, plaintiff complained that a bumpy truck ride caused pain in her right hip. Bending forward caused plaintiff pain, and her right lumbar area was tender. Dr. Hoernschemeyer stated that she had no symptoms implicating her spine and assessed muscle pain. (Tr. 276-78.)

On October 27, 2005, a nurse saw plaintiff to address Dr. Cramp's observation of asymmetry

in plaintiff's shoulders and noted plaintiff's weight gain. Dr. Hoernschemeyer recommended that she continue her back exercises, which the nurse reviewed with plaintiff. (Tr. 279-81.)

On April 20, 2006, plaintiff saw Raj Kakarlapudi, M.D., and had no complaints. Dr. Kakarlapudi noted that plaintiff was "doing extremely well." Dr. Hoernschemeyer recommended that plaintiff decrease her weight. (Tr. 282-84.)

On September 14, 2006, plaintiff reported that she had pain in her right shoulder after bending to lift her bag and hearing a popping sound. A nurse observed tenderness in her right shoulder and opined that a muscle strain unrelated to her surgery caused the pain. The nurse recommended physical therapy to strengthen her shoulder muscle and iontophoresis.[4] The nurse also recommended that plaintiff avoid carrying heavy school books. (Tr. 285-87.)

On February 4, 2008, plaintiff complained of intermittent pain in her low back and buttocks that began two weeks earlier and increased when bending forward. Her right shoulder pain had dissipated. Adam Bloemke, M.D., prescribed Percocet and recommended a spinal CT scan. (Tr. 288-90.)

On February 25, 2008, plaintiff underwent a spinal CT scan, but Michael Khazzam, M.D., could not find the cause of her back and buttock pain. (Tr. 291-93.)

On December 18, 2008, plaintiff complained that her low back pain increased after she lifted an object. X-rays revealed no abnormalities. Matthew Jones, M.D., noted the possibility that the lumbar spine fusion had failed. Dr. Jones discussed the treatment options of further surgery and spinal injections with plaintiff. He also instructed that cigarette smoking could negatively affect her spinal fusion and advised her to stop. (Tr. 294-96.)

---

[4] Iontophoresis is the introduction into the tissues, by means of an electric current, of the ions of a chosen medication. Stedman at 998.

On February 1, 2009, plaintiff went to the emergency room and complained of back pain that began abruptly and lasted four hours. Plaintiff described the pain as severe and sharp and stated that she could not bend. Henry David, M.D., prescribed Cyclobenzaprine and Naproxen.[5] (Tr. 186-89.)

On February 3, 2009, plaintiff indicated that moving furniture caused abrupt back pain. Plaintiff complained that her prescriptions did not relieve her pain. She was prescribed Percocet and Flexeril.[6] (Tr. 197.)

On March 2, 2009, at age 18, plaintiff reported continued severe back pain. She rated the pain as 7 out of 10 and stated that lifting increased the pain. She stated that due to pain, she could walk continuously for only thirty minutes and sit continuously for only twenty minutes. Plaintiff continued to smoke half of a pack of cigarettes per day. X-rays and CT scans revealed a degenerative spinal segment below the fusion as well as a loose screw. Daniel Babbel, M.D., planned to alleviate her pain with surgery. He advised plaintiff to quit smoking and told her that her nicotine levels would be tested a week before surgery. Dr. Babbel prescribed Valium and a lumbar corset. Plaintiff stated that she would not use a lumbar corset because it would cause discomfort. (Tr. 183-85.)

On June 6, 2009, Ioan Dacila submitted a Physical Residual Functional Capacity Assessment form regarding plaintiff. He found that plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand or walk about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday. He also found that plaintiff could only occasionally climb ramps or stairs,

---

[5] Cyclobenzaprine is used short-term to treat muscle spasms. WebMD, http://www.webmd.com/drugs (last visited on March 6, 2013). Naproxen is used to relieve pain. Id.

[6] Flexeril is also known as Cyclobenzaprine. WebMD, http://www.webmd.com/drugs (last visited on March 6, 2013).

balance, kneel, crouch or crawl, could never climb ladders, ropes, or scaffolds, and should avoid concentrated exposure to vibrations. Ioan Dacila found no evidence that attention deficit hyperactivity disorder (ADHD) contributed to plaintiff's lack of employment and that plaintiff could perform jobs existing in significant numbers in the national economy. His opinions were summary in nature. (Tr. 208-15.)

On August 20, 2009, Virginia Caputy, Ph.D, performed an initial assessment on plaintiff. Plaintiff reported suffering from ADHD and thinking about her father who passed away when she was ten years old. She felt angry and sad. Dr. Caputy diagnosed plaintiff with major depressive disorder and ADHD and gave her a GAF score of 50.[7] (Tr. 332-38.)

On February 3, 2010, plaintiff requested Xanax.[8] She reported that she was smoking marijuana eight to ten times a month. She claimed that she had tried her friend's Xanax and that the other medications she tried made her angry or suicidal. Nurse Andrea Earlywine's impression was that abandonment caused plaintiff's depression and behavioral issues and that she abused drugs to cope. Andrea Earlywine diagnosed plaintiff with mood disorder and gave her a GAF score of 50. (Tr. 347-48.)

On April 5, 2010, plaintiff stated that she needed help with her anger and that she was always

---

[7] A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worst of the two components.
   A score from 41 to 50 represents serious symptoms (such as thoughts of suicide, severe obsessional rituals, frequent shoplifting), or any serious impairment in social, occupational, or school functioning (such as the inability to make friends or keep a job). American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 32–34 (4th ed. 2000) ("DSM-IV-TR").

[8] Xanax is used to treat anxiety and panic disorders. WebMD, http://www.webmd.com/drugs (last visited on March 6, 2013).

angry or sad. She reported breaking things and punching herself in the face. Andrea Earlywine prescribed Invega and gave a GAF score of 50.[9] (Tr. 346.)

On May 17, 2010, plaintiff stated that her anger problems had improved. She rated her depression as 7 out 10. Andrea Earlywine discontinued Invega because it caused lactation and prescribed Paxil and Tegretol.[10] Plaintiff received a GAF score of 52.[11] (Tr. 317.)

On June 24, 2010, plaintiff complained that Paxil caused anger and Tegretol caused nausea. She rated her level of depression as 5 or 6 out of 10. Andrea Earlywine discontinued Paxil and Tegretol and prescribed Depakote and Buspar.[12] Plaintiff received a GAF score of 54. (Tr. 318.)

On July 23, 2010, plaintiff stated that Buspar caused shakiness and nausea and Depakote caused nausea. She reported anger problems, including tearing, punching, and fighting with her boyfriend. Andrea Earlywine diagnosed plaintiff with bipolar II disorder and discontinued Buspar. Plaintiff received a GAF score of 54. (Tr. 319.)

On September 17, 2010, plaintiff reported struggling with anxiety attacks that turned into

---

[9] Invega is used to treat certain mental or mood disorders. WebMD, http://www.webmd.com/drugs (last visited on March 6, 2013).

[10] Paxil is used to treat depression, panic attacks, obsessive-compulsive disorder, anxiety disorders, and posttraumatic stress disorder. WebMD, http://www.webmd.com/drugs (last visited on March 6, 2013). Tegretol is used to prevent and control seizures and to treat certain mental or mood conditions. Id.

[11] A score from 51 to 60 represents moderate symptoms (such as flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (such as few friends, conflicts with peers or co-workers). DSM-IV-TR at 34.

[12] Depakote is used to treat seizure disorders and certain psychiatric conditions and to prevent migraine headaches. WebMD, http://www.webmd.com/drugs (last visited on March 6, 2013). Buspar is used to treat anxiety. Id.

anger. Jennifer Brockman, M.D., diagnosed bipolar II disorder and personality disorder and gave a GAF score of 45. She prescribed "Symbax" and Xanax.[13] (Tr. 320-23.)

On October 29, 2010, Dr. Brockman submitted a Mental Ability To Do Work Assessment form regarding plaintiff. Dr. Brockman noted that plaintiff acted appropriately when stable but could quickly become disproportionately irritable and physically aggressive. She stated that plaintiff's depression and anxiety caused decreased organization, memory, comprehension, and attention. She found that plaintiff's mental health would worsen in a work situation and that plaintiff could not compete in an open job market. (Tr. 217-18.)

On November 3, 2010, Lisa Clervi, licensed psychologist, reported that she had counseled plaintiff since April 13, 2010. She diagnosed posttraumatic stress disorder and bipolar disorder and gave her a GAF score of 41. (Tr. 219.)

On November 9, 2010, plaintiff complained of low back and right buttock pain, which she rated at level 6 out of 10. Tom Reinsel, M.D., recommended an MRI scan on her lumbar spine. (Tr. 300-02.)

On December 6, 2010, plaintiff received an MRI scan on her lumbar spine. Donald Mueller, M.D., found the scan unremarkable but noted that a metallic artifact impeded the view. (Tr. 315-16.)

**Testimony at the Hearing**

A hearing was conducted before an ALJ on January 27, 2011. (Tr. 24-44.) Plaintiff testified to the following. She finished the tenth grade but stopped attending school due to emotional problems and her back. (Tr. 27.)

---

[13] WebMD reveals no medication referred to as Symbax. However, Symbyax is used to treat certain mental or mood disorders and depression. WebMD, http://www.webmd.com/drugs (last visited on March 6, 2013).

A few years ago, she underwent surgery to correct scoliosis. During the procedure, four rods were placed in her back and some ribs were removed. She continues to see doctors for checkups and MRI scans and has scheduled further appointments. She visits the hospital because of her back pain. The pain occasionally radiates up her back and to her hip. She has had the pain since her enrollment in school, which made sitting and concentration difficult. Usually, she elevates her feet when she sits to remove pressure from her low back. After about twenty-five minutes of sitting, her back cramps. After thirty minutes of standing, pain requires her to walk or sit. She can lift only about five pounds. (Tr. 28-30.)

She takes Percocet and Flexeril to alleviate pain. She takes three or four Percocet pills per day. She previously used marijuana due to her tumultuous childhood but also to relieve her back pain, stress, and anxiety. She stopped using marijuana after her therapist prescribed her medication. She last used marijuana four or five months ago and only used when she exhausted her medication, which happened about once or twice per month. Last year, she was arrested for hitting someone. (Tr. 30-32.)

She is unmarried, childless, and lives in a trailer with her grandmother and aunt. She is twenty years old and receives food stamps. Her case worker and therapist support her. Her friends have provided her with marijuana to alleviate pain at no cost. (Tr. 33-34.)

At home, she bowls on her Wii console. She walks her dog and watches movies. She has few friends. She plans on returning to school to become a teacher. She last worked at McDonald's, but the pain caused by walking on concrete floors quickly ended her employment. She performs household chores and goes to the grocery store. She has no driver's license and has never taken the licensing test. (Tr. 34-35.)

She cannot work because her low back pain makes walking and bending difficult. She has very little education. She plans to get a GED and attend school for secretarial work, teaching, or other less physically demanding jobs. (Tr. 35-36.)

She receives therapy from Lisa Clervi for bipolar disorder, anxiety disorder, anger problems, and posttraumatic stress disorder. She had "a very bad childhood" because her brother abused her. Her mental condition affects her ability to get a job because it causes difficulty interacting with others, inarticulateness, anger, and stress. (Tr. 36-37.)

Despite doctor's instructions to quit smoking as a prerequisite to undergoing surgery, she continues to smoke half a pack of cigarettes per day. She does not drink. During the past seven months, she has been receiving psychiatric treatment from Dr. Brockman. Case worker Elise Drasball attended the hearing with plaintiff and works for the Arthur Center. She picks up plaintiff weekly to discuss plaintiff's anger, stress, and daily life. Elise Drasball helps her find food and transportation when needed. (Tr. 37-39.)

Drastic changes in life cause her stress. Her mood can change from happy to extremely upset within minutes. She cries when she becomes mad, and her sadness turns into anger. Although they have their battles, she gets along with her mother and grandmother. During her bad days, she takes walks, draws, or reads. To get away from her family, she goes to friends' houses, takes her dog on walks, or sits outside. She also experiences manic phases of extreme happiness. She has difficulty sleeping but takes mood stabilizers at night to help. (Tr. 39-40.)

Vocational expert (VE) Marcia Hield also testified at the hearing. The VE testified that plaintiff had no previous work history. The ALJ presented a hypothetical question concerning an individual of the same age, education, and work history as plaintiff. The individual could only

occasionally lift or carry twenty pounds, frequently carry ten pounds, stand or walk only six hours in an eight-hour workday, and sit for only six hours in an eight-hour workday. The individual would be limited to occasionally climbing stairs or ladders, balancing, stooping, kneeling, and crouching and should avoid concentrated exposure to vibration. The individual would also have attention deficit disorder and occasionally fail to take medication as prescribed. (Tr. 41-42.)

The VE replied that such individual could perform the job of a hand bander, which is light and unskilled work, with 355,000 positions nationally and 6,000 in Missouri; housekeeper, which is light and unskilled work, with 400,000 positions nationally and 4,300 in Missouri; and small product assembler, which is light and unskilled work with 169,000 positions nationally and 1,900 in Missouri. (Tr. 42-43.)

Plaintiff's attorney altered the hypothetical individual by adding that the individual would have no useful ability to handle work stress, function independently, behave in an emotionally stable manner, or relate predictably in social situations. The individual would further suffer serious limitations regarding following work rules, relating to coworkers, dealing with the public, using judgment, interacting with supervisors, maintaining attention and concentration, and demonstrating reliability. The VE responded that such individual could not perform the jobs previously identified. (Tr. 43.)

### **III. DECISION OF THE ALJ**

On February 23, 2011, the ALJ issued a decision that plaintiff was not disabled. (Tr. 10-19.) Initially, the ALJ found that plaintiff was qualified to claim benefits as the dependent child of a deceased wage earner, her father George Dunlap. Then, at Step One of the prescribed regulatory

decision-making scheme,[14] the ALJ found that plaintiff had not engaged in substantial gainful activity since April 16, 2009, the alleged onset date. At Step Two, the ALJ found that plaintiff's severe impairments were scoliosis, post status T2-L4 fusion, attention deficit hyperactivity disorder, and mood disorder. (Tr. 13.)

At Step Three, the ALJ found that plaintiff had no impairment or combination of impairments that met or was the medical equivalent of an impairment on the Commissioner's list of presumptively disabling impairments. (Id.)

The ALJ considered the record and found that plaintiff had the residual functional capacity (RFC) to perform light work, except that she cannot climb ladders, ropes, or scaffolds, can only occasionally climb stairs, balance, stoop, kneel, crouch, and crawl, and must avoid concentrated exposure to vibrations. The ALJ also found that plaintiff had deficits in maintaining attention but could still perform less demanding work. At Step Four, the ALJ found that plaintiff had no past relevant work. (Tr. 14-17.)

At Step Five, the ALJ found plaintiff capable of performing jobs existing in significant numbers in the national economy. (Tr. 18.)

### IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the

---

[14] See below for explanation.

evidence is substantial, the court must consider evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. § 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her impairment meets or equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work (PRW). Id. § 404.1520(a)(4)(iv). The claimant bears the burden of establishing the Step Four factor. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant has the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 404.1520(a)(4)(v).

## V. DISCUSSION

Plaintiff argues that the ALJ failed to give proper consideration to the opinions of her treating psychiatrist Jennifer Brockman and her treating therapist Lisa Clervi, which caused the ALJ to err in determining the effect of plaintiff's mental limitations on her RFC. The court agrees.

Under the Commissioner's regulations, a treating physician's opinion is entitled to controlling weight if supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence. Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000) (citing 20 C.F.R. § 404.1527(d)(2)). The ALJ must give reasons for her assessment of the opinions of treating physicians. Id. Discounting such opinions is appropriate where "other assessments are supported by better or more thorough medical evidence," or where "a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Id.

The ALJ determined that plaintiff's mental RFC limitations consisted solely of "some deficits in maintaining attention" that left plaintiff capable of performing less demanding work. (Tr. 17.) In arriving at this conclusion, the ALJ afforded the opinions of plaintiff's treating psychiatrist and treating therapist minimal weight, finding that "the opinions of Ms. Clervi and Dr. Brockman are not supported by medically acceptable clinical and laboratory diagnostic techniques and are not consistent with the other substantial evidence in the record." (Id.) The ALJ did not further elaborate on her reasons for discounting the opinions. (Id.)

Nothing in the record indicates that either plaintiff's treating therapist or her treating psychiatrist rendered inconsistent opinions, nor does the record contain contradictory assessments supported by better or more thorough evidence. The sole contradictory assessment consists of a Physical Residual Functional Capacity Assessment form completed by Ioan Dacila. (Tr. 208-15.)

Although Ioan Dacila indicated that he could find no evidence to support a finding that ADHD affected plaintiff's ability to work, the form predated the year when plaintiff regularly sought mental health treatment. (Tr. 215.) Further, GAF scores and the five-axis diagnostic system used by plaintiff's therapist and psychiatrist as diagnostic tools are relevant factors in assessing mental impairments. See, e.g., Pearsall v. Massanari, 274 F.3d 1211, 1215 (8th Cir. 2001); Pate-Fires v. Astrue, 564 F.3d at 943; Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005); Hamel v. Astrue, 620 F. Supp. 2d 1002, 1019 (D. Neb. 2009); Boertje v. Astrue, 848 F. Supp. 2d 952, 959 (S.D. Iowa 2012).

The Commissioner argues that the opinions of plaintiff's therapist and psychiatrist are inconsistent with the record because of her daily living activities and because her mental impairments improved when she complied with her treatment. The court disagrees.

The Commissioner states that plaintiff's daily activities consisted of "socializing with friends, caring for pets, preparing easy meals, performing simple household chores, shopping, watching television shows and movies, reading, drawing, sewing, playing cards and board games, doing puzzles including crossword puzzles, texting with friends, and playing video games." (Doc. 23 at 7.) The Commissioner further states that plaintiff performed yard work and cites authority stating that such activities are "inconsistent with subjective complaints of pain." (Id. (citing Medhaug v. Astrue, 578 F.3d 805, 817 (8th Cir. 2009).)

However, plaintiff's arguments concern her mental condition, not her subjective complaints of pain. Plaintiff's therapist and psychiatrist do not indicate that plaintiff does not have the exertional capability to perform such activities. Rather, Dr. Brockman stated that plaintiff suffers from mood swings and that plaintiff is functional when stable but can quickly become unreliable and

unpredictable, which is consistent with plaintiff's ability to perform such activities. (Tr. 217-18.) Further, the Eighth Circuit has repeatedly held that "the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work." Draper v. Barnhart, 425 F.3d 1127, 1131 (8th Cir. 2005).

The Commissioner also argues that plaintiff's mental impairments improved when she complied with her treatment and, therefore, cannot support a finding of disability. "Impairments that are controllable or amenable to treatment do not support a finding of disability, and failure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits." Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir. 1997). The record indicates that plaintiff's condition improved with treatment, but it does not indicate that treatment controlled the mental conditions described by plaintiff at the hearing, which included bipolar disorder, anxiety disorder, mood disorder, and posttraumatic stress disorder. (Tr. 36.) While the Eighth Circuit uses the word "amenable," the court's rule cannot be reasonably interpreted to indicate that only untreatable conditions, incapable of any improvement, can render a claimant disabled. The record indicates that the effects of plaintiff's mental conditions persisted even when plaintiff complied with treatment. (Tr. 324-31.) Although her mental conditions improved with treatment, mere improvement does not bar a condition from supporting a finding of disability.

Admittedly, the record indicates that plaintiff failed to follow prescriptions. (Tr. 317-24.) However, plaintiff stopped taking these medications because of vomiting, lactation, inducement of anger, and shakiness, and the record does not indicate that her conduct was unreasonable. (Id.) Dr. Brockman noted that she could not find a successful medication regimen for plaintiff. (Tr. 322, 326, 330.) The record further indicates that plaintiff agreed with Dr. Brockman to not share her

medication, not to get it from any other source, and to take her medications as prescribed, with no mention that plaintiff breached that agreement. (Tr. 323, 326, 330.) In sum, the record unequivocally indicates that, when plaintiff failed to follow a course of treatment for her mental condition, she had ample reason.

In conclusion, the ALJ improperly discounted the opinions of plaintiff's treating therapist and her treating psychiatrist. In circumstances that apply to this case, the Commissioner's regulations state:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(c)(2). Nothing in the record demeans the controlling weight and credibility of the opinions of plaintiff's treating psychologist, Dr. Jennifer Brockman, and her treating therapist, Lisa Clervi, expressed during 2010, described above.

Thus, at Step Five of the required analysis, the Commissioner failed to sustain the burden on the Social Security Administration to determine whether plaintiff could perform substantial gainful activity that exists in significant numbers in the national economy. The decision denying plaintiff's disability benefits is not supported by substantial evidence.

Substantial evidence in the record is unequivocal to establish that plaintiff is entitled to period of disability beginning October 29, 2010, and continuing thereafter. Pate-Fires v. Astrue, 564 F.3d at 947.

Therefore, this case will be remanded to the Commissioner of Social Security for an award of benefits consistent with this memorandum opinion. An appropriate Judgment Order is issued herewith.

Dated this 6th day of March, 2013.

/s/ Jean C. Hamilton
UNITED STATES DISTRICT JUDGE